UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

SHIRLEY SHEPHERD            :
                            :
     v.                     :     C.A. No. 12-143L
                            :
AIR & LIQUID SYSTEMS        :
CORP., et al.               :

**REPORT AND RECOMMENDATION**

Lincoln D. Almond, United States Magistrate Judge

This asbestos case was commenced by Plaintiff in Rhode Island Superior Court on or about January 26, 2012. (Document No. 1 at ¶ 1). Plaintiff alleges that Mr. Roy Shepherd was injured due to exposure to "various asbestos containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products, working as a boiler tender in the United States Navy from 1964 to 1977." (Document No. 1-1 at p. 5). Pending before the Court is Defendant Crane Company, LLC's ("Crane") Motion for Summary Judgment (Document No. 427) filed pursuant to Fed. R. Civ. P. 56. Plaintiff filed an Objection to the Motion. (Document No. 511). A hearing was held on January 14, 2015. This matter has been referred to me for preliminary review, findings and recommended disposition. 28 U.S.C. § 636(b)(1)(B); LR Cv 72(a). After reviewing the Memoranda submitted by the parties and the relevant case law, I recommend that Crane's Motion for Summary Judgment be DENIED.

**Background**

Crane acknowledges that its products (valves and deaerating feedtanks) were present on some of the ships that Mr. Shepherd served aboard, but argues that its products were not a substantial factor in causing Mr. Shepherd's mesothelioma. Crane rests its Motion, in part, on the fact that neither Mr.

Shepherd nor either of his shipmates specifically recalled working with Crane products. Plaintiff counters that she has submitted sufficient evidence of exposure/causation/product identification to survive the summary judgment challenge. Crane submitted a Statement of Undisputed Facts, to which Plaintiff responded. (Document Nos. 427-2, 511-1) Plaintiff also submitted a Statement of Additional Material Facts, to which Crane responded. (Document Nos. 511-2, 562).

**Statement of Facts**

Mr. Shepherd worked as a boiler tender while serving in the United States Navy from 1964 to 1977 aboard various ships. Mr. Shepherd worked "with and around others working with asbestos containing products and their asbestos containing component parts, in the boiler rooms of Naval ships. These products include, but are not limited to: gaskets, turbines, steam traps, valves, pumps, packing, boilers and compressors." (Document No. 427-2 at ¶ 4). Crane manufactured valves that were installed, maintained, serviced and repaired on the U.S.S. Fiske, the U.S.S. Farragut and the U.S.S. Byrd. (Document No. 511-2 at ¶ 24).

Mr. Shepherd testified in his deposition on March 5, 6 and 7, 2012 that he did not recall working with or around any valves, nor did he recall working with any Crane products. (Document No. 427-2 at ¶¶ 6, 7). Also during his deposition, Mr. Shepherd specifically and repeatedly testified that "if it was down there, I worked on it" when asked about what equipment he worked on in the firerooms of the various ships. Specifically, when asked about the firerooms aboard the U.S.S. Fiske, U.S.S. Byrd and U.S.S. Farragut, Mr. Shepherd repeated that "if it was down there, I worked on it" as to each one of the firerooms located on those ships. (Document No. 441-10 at pp. 43-45). Throughout his testimony, Mr. Shepherd also noted that he had difficulty recalling the names of the various equipment, but that he worked on everything in each fireroom. Id. at pp. 22, 42. Mr. Shepherd died shortly after his deposition was taken, on March 27, 2012. (Document No. 309-1). Plaintiff's

discovery responses allege that Mr. Shepherd worked "with and around others working with asbestos containing products and their asbestos containing component parts, in the boiler rooms of Naval ships. These products include, but are not limited to: gaskets, turbines, steam traps, valves, pumps, packing, boilers and compressors." (Document No. 427-2 at ¶ 4). The discovery responses do not identify any specific asbestos-containing Crane products which Roy Shepherd worked with or around. Id. at ¶ 5.

## I. U.S.S Fiske

Crane manufactured steam, auxiliary exhaust, gland sealing and fuel oil valves for engine and firerooms on the U.S.S. Fiske. (Document No. 512-1 at p. 13). Crane's drawings specify the use of asbestos sheet gaskets for internal bonnet gaskets and asbestos packing to seal valve stems. Id. Aside from Mr. Shepherd's general testimony, the only other source of testimony concerning the U.S.S. Fiske was Plaintiff's expert, Captain Arnold Moore.

## II. U.S.S. Farragut

Anthony Tronco, a shipmate of Roy Shepherd aboard the U.S.S. Farragut, began his naval service in July of 1968 and was then assigned to the U.S.S. Farragut in May of 1969 as a fireman. The U.S.S. Farragut had two boiler rooms. Mr. Tronco testified that he had the opportunity to observe both the forward and aft boiler rooms, calling them a "mirror image" with the "same equipment." (Document No. 511-2 at ¶ 33). Mr. Tronco estimated that there were hundreds of valves aboard the U.S.S. Farragut. The valves ranged in size from one inch to twelve inches. Mr. Tronco described the asbestos blanket covering valves on the U.S.S. Farragut. He testified that workers would have to remove the blanket to open the valve, creating debris. Id. at ¶ 34.

After opening the valve, workers would have to use a corkscrew-like tool to remove the worn packing from the valve, pulling at the packing material multiple times because the worn packing material would break during the process. Mr. Tronco also described the process of removing gaskets

from the flange of a valve. When a worn gasket had to be removed, the boilermen would use a putty knife to first scrape the worn gasket off of the valve and then a wire brush to clean off the residue. Id. at ¶ 35. Plaintiffs expert, Dr. David Kern, has opined that Mr. Shepherd's exposure to asbestos-containing valves was a substantial contributing factor in causing his mesothelioma. Id. at ¶ 37).

Crane points out that, at his deposition, Mr. Tronco did not identify any Crane products. (Document No. 427-2 at ¶ 8). In further support of its Motion, Crane argues that the testimony of Plaintiff's expert Captain Arnold Moore supports judgment in its favor. Captain Moore testified that he never spoke with Mr. Shepherd or any of his co-workers, and had never been aboard any of the ships on which Mr. Shepherd served. Based on his review of ship records, Captain Moore identified the presence of a "handful of Crane Co. products (valves and two deaerating feedtanks) on some of Mr. Shepherd's ships," however, Captain Moore admitted that beyond the information contained in his Navy personnel records and testimony deposition he had no direct knowledge of what Mr. Shepherd actually did onboard any ship. Id. at ¶¶ 10-11.

Captain Moore further admitted that due to the passage of time between the commissioning of these ships to the time Mr. Shepherd ultimately served on them, it was "extremely unlikely that he [Mr. Shepherd] worked with any gaskets or packing that was there at the original time the ship was built." Id. at ¶ 12. Captain Moore stated that he could not opine that it was more likely than not that Mr. Shepherd was exposed to any asbestos-containing components originally supplied by Crane. Id. at ¶ 13. Captain Moore also stated that he had no way of knowing what specific brands of gaskets and packing were used as replacement materials on board the ships on which Mr. Shepherd served, and further that he had no information that Mr. Shepherd ever had any contact with any asbestos-containing replacement component supplied by Crane.

### III. U.S.S. Byrd

Mr. Tiffner was a shipmate of Roy Shepherd aboard the U.S.S. Byrd, serving aboard that ship from January 1971 to January 1976. Crane points out that at his deposition, he also did not identify any Crane products. (Document No. 427-2 at ¶ 9). Plaintiff counters that Mr. Tiffner testified that there were hundreds of valves in the fireroom that he supervised. The valves ranged in size from approximately six inches to an inch. The fireroom personnel would be required to perform maintenance or repair work on the valves. Further, Mr. Tiffner testified that fireroom personnel would be responsible for regularly changing gaskets and packing material in the valves. (Document No. 511-2 at ¶ 28).

Mr. Shepherd testified that he participated in the Navy's "planned maintenance system." Mr. Tiffner testified that service and maintenance of valves in the fireroom was part of the Navy's planned maintenance system. Mr. Shepherd specifically testified that not only was he familiar with the planned maintenance system, he took part in it. "We had to - to do the maintenance. We go with the PMS planned maintenance system." Id. at ¶ 29. When describing the process of replacing the packing in a valve, Mr. Tiffner testified that, "[w]ell, sometimes, you were able to change the packing in place, then other times you would have to take the bonnet off the body and try to take the packing out that way. Sometimes you used the packing puller, in hoping that it would take everything out, and if it didn't, then you had to scrape it out and take it out. Sometimes it would be pulverized." When the worn packing was removed from the valve, it "wouldn't be in the form that it went in;" rather, "sometimes, it would come out in pieces and pieces and pieces." In situations where the packing could not be removed from a valve easily, "you would pull it out and blow it out and try to take it out." Mr. Tiffner testified that a boiler tender would be blowing out "[t]he dust or the particles that we couldn't pull out with the extractor." Id. at ¶ 30.

Replacement packing came in a roll which a fireman would have to cut to the desired size. A boiler tender would use a utility knife to cut the replacement packing for the valve. Working with the replacement packing created visible dust in the fireroom. Mr. Tiffner testified that "there would be fibers. The packing was wire-impregnated, so the wire would be there, but then there would be particles." Id. at ¶ 31. The planned maintenance system also required that flange gaskets on certain valves be routinely changed. "The bigger valves had gaskets on the inlet and outlet sides of the valves." The worn gaskets would 'stick' to the valve, so the boiler tenders had to "knock it off with a hammer, and then clean it up with a scraper and then a cup brush again." Id. at ¶ 32.

Mr. Shepherd established the fact that, depending on what rank he held during his naval career, if he was not personally working with a product in the fireroom, then he would have personally supervised the men who cleaned the visible debris created by the machinery and products used in the fireroom. Specifically, Mr. Shepherd stated that "as the junior second class, I was in charge of the clean up, making sure the clean up, all the clean up had got done. I was in charge of giving - giving all the third class below their cleaning assignments, making sure all the clean up work got done." As he progressed in rank, he went from directly working with and around asbestos-containing products to actually supervising other boiler tenders, ensuring that the debris created by such products in his fireroom was properly cleaned up. (Document No. 511-2 at ¶ 27).

### IV. Crane

Crane admits that it manufactured industrial equipment, such as pumps and valves, which incorporated asbestos-containing internal components, including gaskets and packing. Id. at ¶ 40. Anthony Pantaleoni, Crane's Vice President of environmental health and safety testified for Crane as its corporate designee and corporate representative. According to Mr. Pantaleoni, Crane manufactured and sold valves that contained asbestos components as early as 1858. Those asbestos components were

gaskets and rope packing. Crane was not just an assembler of valves but it actually designed and manufactured them. Crane manufactured valves with asbestos-containing gaskets and packing up until the late 1980s. Id. at ¶¶ 42, 43. Crane's valve designers specified the use of asbestos-containing gaskets and packing in Crane valves. Crane also sold asbestos-containing thermal insulation products including pipe covering, block insulation and insulation cement. Crane sold these asbestos-containing thermal insulation products into the early 1970s. Crane also sold asbestos-containing sheet packing which was used to make gaskets under the brand name Cranite. Cranite was manufactured by other entities solely for Crane. Id. at ¶¶ 44-46.

Crane admits that it was foreseeable to Crane that the gaskets and packing on its valves would need to be replaced. Indeed, Crane knew its customers would have to do repairs. Crane was aware that gaskets and packing on its valves in steam systems would often bake onto the valves, requiring that they be chiseled or scraped at, using a chisel, flat knife or wire brushes to remove the materials baked onto the valve. Id. at ¶ 55. Crane did not affix any warning regarding the hazards of asbestos to their products, including valves, until the mid-1980s. Id. at ¶ 56.

**Summary Judgment Standard**

Summary Judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When deciding a motion for summary judgment, the Court must review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. Cadle Co. v. Hayes, 116 F.3d 957, 959 (1st Cir. 1997).

Summary judgment involves shifting burdens between the moving and the nonmoving parties. Initially, the burden requires the moving party to aver "an absence of evidence to support the

nonmoving party's case." Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). Once the moving party meets this burden, the burden falls upon the nonmoving party, who must oppose the motion by presenting facts that show a genuine "trialworthy issue remains." Cadle, 116 F.3d at 960 (citing Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995); Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994)). An issue of fact is "genuine" if it "may reasonably be resolved in favor of either party." Id. (citing Maldonado-Denis, 23 F.3d at 581).

To oppose the motion successfully, the nonmoving party must present affirmative evidence to rebut the motion. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-257 (1986). "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, [or] unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). Moreover, the "evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve." Id. (quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)). Therefore, to defeat a properly supported motion for summary judgment, the nonmoving party must establish a trialworthy issue by presenting "enough competent evidence to enable a finding favorable to the nonmoving party." Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993) (citing Anderson, 477 U.S. at 249).

**Discussion**

In its Motion for Summary Judgment, Crane argues that there is insufficient evidence to establish that its equipment was a "substantial factor" in causing Mr. Shepherd's injury, and that the so-called "bare-metal" defense shields it from liability. (See Document No. 427 at pp. 4-7). Crane

also asserts that Mrs. Shepherd's claim for loss of consortium does not survive its summary judgment challenge. In her Objection to the Motion for Summary Judgment, Plaintiff identifies several factual issues that she claims are material and preclude entry of summary judgment in Crane's favor. The Court will discuss each in turn.

> **A.** **Whether the Crane Asbestos-Containing Equipment was a "Substantial Factor" in Causing Mr. Shepherd's Illness**

Crane moved for summary judgment, arguing that there is "no record evidence that Mr. Shepherd worked with an asbestos-containing product placed in the stream of commerce by Crane...." (Document No. 427-1 at p. 6). In its Reply to Plaintiff's Objection, Crane characterizes this as a "threshold issue" and argues that "there is no evidence of Mr. Shepherd's exposure to asbestos in connection with any Crane Co. valves." (Document No. 560 at p. 1, n1). Crane argues that Plaintiff's product identification evidence is insufficient and that Plaintiff has not met her burden of setting forth sufficient evidence from which a reasonable jury could conclude that Crane's product was a "substantial factor" in causing Mr. Shepherd's mesothelioma. Plaintiff, on the other hand, claims that the expert reports and testimony from Mr. Shepherd's shipmates provides sufficient evidence to prove that asbestos from Crane's equipment was a substantial factor in causing his injury.

In order to prove causation, "a plaintiff may rely upon direct evidence (such as testimony of the plaintiff or decedent who experienced the exposure, co-worker testimony, or eye-witness testimony) or circumstantial evidence that will support an inference that there was exposure to the defendant's product for some length of time." Walkup v. Air & Liquid Sys. Corp., CV 12-1635-SLR-SRF, 2014 WL 2514353 (D. Del. June 4, 2014) report and recommendation adopted, CV 12-1635-SLR-SRF, 2014 WL 4447568 (D. Del. Sept. 8, 2014) (citing Abbay v. Armstrong Int'l, Inc., MDL No. 875, 2012 WL 975837 at *1 n.1 (E.D. Pa. Feb. 29, 2012)). "On the other hand,

'[m]inimal exposure' to a defendant's product is insufficient to establish causation. Likewise, a mere showing that defendant's product was present somewhere at plaintiff's place of work is insufficient.'" Id. (quoting Lindstrom v. A-C Prod. Liab. Trust, 424 F.3d 488, 492 (6th Cir. 2005)). "Rather, the plaintiff must show 'a high enough level of exposure that an inference that the asbestos was a substantial factor in the injury is more than conjectural." Id. (quoting Abbay, 2012 WL 975837 at *1 n.1).

Examining the evidence submitted, the Court finds that Plaintiff has identified sufficient evidence to present a trialworthy issue as to whether Mr. Shepherd's exposure to Crane products was a substantial factor in causing his mesothelioma. As noted, Mr. Shepherd repeatedly testified that if the equipment was located in the fireroom, he worked on it. (See Document No 441-10 at pp. 42-46). Moreover, with respect to the U.S.S. Farragut, his shipmate Mr. Tronco testified that there were hundreds of valves in the fireroom, and he described in detail the process used to replace the valves and the asbestos dust created by that process. See supra at p. 3. Likewise, Mr. Tiffner testified about the dust and particles created during the replacement of gaskets and packing on the numerous valves in the U.S.S. Byrd's firerooms. See supra at pp. 5-6. There is also testimony that Mr. Shepherd would have been present for the cleanup, and would have either participated in the cleanup or would have supervised. Id. at p. 6. Crane's Reply notes that the combination of Mr. Shepherd's testimony, coupled with the testimony of his shipmates and Captain Moore appears to create a disputed fact, "at first blush." (Document No. 560 at p. 3). Crane then goes on to argue that Plaintiff is attempting to mislead the Court by quoting Mr. Shepherd's testimony concerning his time aboard the U.S.S. Dahlgren. Id. A complete review of Mr. Shepherd's testimony revealed that he repeated that particular phrase as to each ship at issue with Crane's products. Accordingly, Mr. Shepherd's

testimony and the other supporting evidence presented by Plaintiff, is sufficient, at this stage, to create a trialworthy issue, and I recommend that Crane's Motion for Summary Judgment be DENIED.

### B. Whether Crane is Liable Because it "Knew" Its Pumps Would Require Future Replacement of Asbestos-Containing Components

Next, Crane asserts that it is not liable for asbestos-containing material that it did not place in the stream of commerce. (Document No. 427-1 at p. 6). Crane specifically alleges that it did not "manufacture, sell, or design any asbestos-containing component parts used with [its] products." Id. This defense is sometimes called the "bare-metal" defense. The "bare metal defense" shields a defendant from liability for a duty to warn of hazards inherent in asbestos products that a manufacturer did not manufacture or distribute. Conner establishes a general rule that there is no duty to warn of hazards inherent in asbestos products absent specific evidence that the company manufactured or distributed the particular asbestos-containing parts to which the Plaintiff was exposed. See Conner v. Alfa Laval, Inc., 842 F. Supp. 2d 791, 801 (E.D. Pa. 2012). Here, there are a number of factual disputes that foreclose the possibility of deciding this issue in the Summary Judgment context. Plaintiff asserts that the issue here relates to asbestos component parts that "were integral components of Crane's own end products; were knowingly selected by Crane to be used in its own end products; were sold by Crane; were specified by Crane; and without which Crane's end products would not function properly." (Document No. 511 at p. 25). It is uncontroverted that Crane's valve designers specified the use of asbestos-containing gaskets and packing in Crane valves. It is also uncontroverted that Crane sold asbestos-containing sheet packing which was used to make gaskets under the brand name Cranite. Cranite was manufactured by other entities solely for Crane.[1] (Document No. 511-2 at

---

[1] Crane responded to each of Plaintiff's facts by stating, "[a]dmitted only to the extent that the testimony speaks for itself. Otherwise, denied to the extent the assertions of these paragraphs qualify, contravene or contradict the cited testimony." See Document No. 562 at ¶¶ 43-47. Although Crane is

¶¶ 44-46). Because the Court is required to view the evidence in the light most favorable to the nonmoving party and because Plaintiff has set forth evidence from which a reasonable factfinder could resolve in favor of either party, summary judgment is not appropriate. Accordingly, I recommend that Crane's Motion for Summary Judgment be DENIED.

        **C.     Whether Mrs. Shepherd's Loss of Consortium Claim is Viable**

The next issue is Count 5, Mrs. Shepherd's loss of consortium claim. Crane argues that general maritime law does not allow for a loss of consortium claim, citing several authorities. (Document No. 427-1 at p. 7). Crane then goes on to argue that even if her claim was not barred by general maritime law, it "bears a symbiotic relationship" to Mr. Shepherd's claims, and thus if his claims fail, so does her loss of consortium claim. Id. at p. 8. Plaintiff disagrees, countering that 28 U.S.C. § 1333 "saves to suitors all common law remedies that the common law is competent to give – including disparate state damages for death." (Document No. 511 at p. 49).

In a recent case from the District of Connecticut, the Court declined to accept arguments similar to the ones made by Crane in this case. See Bray v. Ingersoll-Rand Co., 2015 WL 728515 (D. Conn. Feb. 19, 2015). That Court stated, "[s]ome defendants have argued that general maritime law does not allow recovery for loss of consortium claims. [ ] Those arguments conflate the statutory limitations placed on recovery for cases brought under the Death on the High Seas Act ("DOHSA"), 46 U.S.C. § 762, and the Jones Act, 46 U.S.C. § 688, with actions brought under common law. Since 1980, the Supreme Court has held that DOHSA and the Jones Act do not preclude claims made under

---

apparently attempting to dispute these facts, Crane has not cited to any materials in the record that controvert Plaintiff's Statements of Fact. Crane has not properly supported its position as required by Fed. R. Civ. P. 56(c), and the Court therefore considers these facts undisputed for purposes of the Motion pursuant to Fed. R. Civ. P. 56(e)(2).

state common law for wrongful death and loss of society, as well as other personal injury torts." The Court also cited Yamaha Motor Corp., 516 U.S. at 213–216; Jerome B. Grubart, Inc., 513 U.S. at 545 (maritime jurisdiction "does not result in automatic displacement of state law"); cf. In Re Dammers & Vanderheide & Scheepvaart Maats Christina B.V., 836 F.2d 750, 756 (2nd Cir.1988) (noting that general maritime law allows a spouse to bring a common law claim under state law for loss of consortium)". Because the District of Connecticut has succinctly and persuasively concluded that a loss of consortium claim survives in a federal maritime case, I also recommend that the District Court DENY Crane's Motion for Summary Judgment as to the loss of consortium count for the reasons articulated in Bray.

**Conclusion**

For these reasons, I recommend that Crane's Motion for Summary Judgment (Document No. 427) be DENIED. Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within fourteen (14) days of its receipt. See Fed. R. Civ. P. 72(b); LR Cv 72. Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

 /s/   Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
May 13, 2015