UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

SHIRLEY SHEPHERD :
:
v. : C.A. No. 12-143L
:
AIR & LIQUID SYSTEMS :
CORP., et al. :

**REPORT AND RECOMMENDATION**

Lincoln D. Almond, United States Magistrate Judge

This asbestos case was commenced by Plaintiff in Rhode Island Superior Court on or about January 26, 2012. (Document No. 1 at ¶ 1). Plaintiff alleges that Mr. Roy Shepherd was injured due to exposure to "various asbestos containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products, working as a boiler tender in the United States Navy from 1964 to 1977." (Document No. 1-1 at p. 5). Pending before the Court is Defendant Foster Wheeler Company, LLC's ("Foster Wheeler") Motion for Summary Judgment (Document No. 430) filed pursuant to Fed. R. Civ. P. 56. Plaintiff filed an Objection to the Motion. (Document No. 497). A hearing was held on January 14, 2015. This matter has been referred to me for preliminary review, findings and recommended disposition. 28 U.S.C. § 636(b)(1)(B); LR Cv 72(a). After reviewing the Memoranda submitted by the parties and the relevant case law, I recommend that Foster Wheeler's Motion for Summary Judgment be DENIED.

**Statement of Facts**

Mr. Shepherd worked as a boiler tender while serving in the United States Navy from 1964 to 1977 aboard various ships. Although Foster Wheeler concedes that it manufactured some of the

boilers on the U.S.S. Hammerberg, U.S.S. Byrd and U.S.S. Farragut, it contends that its products were not a substantial factor in causing Mr. Shepherd's illness. Plaintiff disagrees and contends she has submitted sufficient evidence of exposure/causation/product identification to survive Foster Wheeler's summary judgment challenge. Foster Wheeler submitted its Statement of Undisputed Facts, and Plaintiff responded with both an Objection and her own separate Statement of Additional Undisputed Facts. (Documents No. 497-1, 497-2). Although Foster Wheeler filed a Reply to Plaintiff's Objection, it did not separately respond to the Statement of Additional Undisputed Facts, as required by LR Cv 56(a)(5).

### I. U.S.S. Hammerberg

After graduating from high school, Mr. Shepherd enlisted in the Navy in the summer of 1964. (Document No. 432 at ¶ 4). Mr. Shepherd went directly into basic training in Great Lakes, Illinois for three months. Mr. Shepherd did not work on any equipment during basic training. Id. at ¶ 5. After completing basic training, following a thirty-day hiatus at home, Mr. Shepherd's first assignment was on the U.S.S. Hammerberg (DE 1015), stationed in Newport, Rhode Island. Id. at ¶ 6. The U.S.S. Hammerberg was laid down on November 12, 1953 at Bath Iron Works in Bath, Maine, approximately eleven years before Mr. Shepherd began his service. Id. at ¶ 7. Mr. Shepherd spent a total of approximately eight months on the U.S.S. Hammerberg. Id. at ¶ 8.

Mr. Shepherd was assigned to mess cook duty for thirty days while the Ship was on a Mediterranean cruise. He was then assigned to a cleanup crew in the berthing area for a couple of weeks before getting transferred to the fireroom, where he remained as a boiler tender. Id. at ¶ 9. In the fireroom, Mr. Shepherd was responsible for standing watch and reading gauges and

remembered assisting a third classman working on a water pump. He also assisted other workers and brought them items they needed for repairs. Id. at ¶ 10; Document No. 497-1 at ¶ 10.

Plaintiff asserts that the evidence shows that Foster Wheeler used asbestos-containing materials in the construction of those boilers and provided additional asbestos-containing materials to be used in the boilers. (Document No. 497-2 at ¶ 87). Plaintiff also asserts that Foster Wheeler provided with the boilers asbestos sheet gaskets, woven asbestos tape, asbestos millboard, brass sheathed asbestos insert packing strip, compressed asbestos sheet economizer outlet manifold seals, compressed asbestos sheet economizer inlet manifold seals, asbestos rope, globe valves with asbestos stem packing, angle valves with asbestos stem packing, asbestos hand-hold gaskets spiral wound asbestos hand-hole gaskets, asbestos plug nut gaskets, asbestos sheet gaskets, flexitallic spiral-wound asbestos gaskets, flexitallic asbestos gaskets, asbestos gaskets covered in soft brass, asbestos gaskets covered in copper, peep door gaskets and square woven asbestos gaskets. (Document No. 497-2 at ¶ 90). Further, Captain Arnold Moore testified that residual asbestos or asbestos freed during maintenance work of the insulation, gaskets and packing would not have been cleaned up on a Navy ship. (Document No. 497-2 at ¶ 91). The U.S.S. Hammerberg returned to Newport, Rhode Island after the Mediterranean cruise, and Mr. Shepherd was transferred to the U.S.S. Fiske. (Document No. 432 at ¶ 12). Plaintiff did not produce for deposition any shipmates from Mr. Shepherd's time on the U.S.S. Hammerberg. Id. at ¶ 13.

## II.      U.S.S. Farragut

The U.S.S. Farragut (DLG 6) was laid down on June 3, 1957 at Bethlehem Steel Corporation Fore River Shipyard in Quincy, Massachusetts and commissioned on December 10, 1960. Id. at ¶ 20. Anthony Tronco, Mr. Shepherd's co-worker aboard the U.S.S. Farragut, testified that there were

two boilers in each of the boiler rooms of the ship. Mr. Tronco specifically recalled that they were 1,200-pound, super-heated steam boilers that were manufactured by Foster Wheeler. (Document No. 497-2 at ¶ 102).

According to Mr. Shepherd, the U.S.S. Farragut was in the process of being overhauled when he boarded it in 1969. (Document No. 432 at ¶ 21). During the approximately three months that Mr. Shepherd was on board during the overhaul, the shipyard workers did the actual overhaul work. He could not recall the work that these other men performed. Id. at ¶ 22. Captain Moore described an overhaul as "a planned repair activity where essentially all the equipment on the ship is overhauled. During the overhaul, maintenance and repair work was going on onboard the ship, which would have generated some level of asbestos, including asbestos remaining from previous repair and maintenance aboard the ship." According to Captain Moore, "equipment manufacturers often provided replacement gaskets and packing for ships in overhaul." (Document No. 497-2 at ¶ 95). According to Captain Moore, the firesides on the U.S.S. Farragut would have been cleaned every 600 hours, so it is likely that they were cleaned several times while Mr. Shepherd was aboard. Id. at ¶ 97.

Mr. Tronco testified that his duties were the same as Mr. Shepherd's in terms of work performed on board the U.S.S. Farragut. (Document No. 432 at ¶ 30). Mr. Tronco testified that he was a boiler tender in the aft boiler room and Mr. Shepherd was a boiler tender in the forward boiler room. He testified that boiler tenders from the aft and forward firerooms would work together to do firesides and watersides work. Id. at ¶ 31. Mr. Tronco testified that during the firesides, the boiler was opened and the inside was cleaned, including removal of all of the brushes and carbon off the tubes. Mr. Tronco stated that watersides involved dismantling the steam and mud drums, punching

tubes and removing all of the baffles. Firesides were completed every 500 hours, and watersides were done every 1,600 hours on the U.S.S. Farragut. (Document No. 497-2 at ¶ 103). Mr. Tronco recalled that there were gaskets between the hatchway and metal of the boiler which had to be removed in order to open up the boiler for the fireside, and the gasket used on the entry point on the steam drum was oval and approximately twenty inches in diameter. The gasket for the opening of the firebox was approximately three feet in diameter. Mr. Tronco used a wire brush to clean the surfaces and a putty knife to peel off the gasket, and a new gasket was installed before the door of the boiler could be reattached and the maintenance work was complete. The gaskets on the boiler were replaced "all the time" and every time the door of the boiler was opened, a new gasket was installed regardless of the work being completed to the interior of the boiler. In his deposition, Mr. Tronco specifically recalled seeing Mr. Shepherd complete fireside work in the forward and aft firerooms of the U.S.S. Farragut. (Document No. 497-2 at ¶ 104).

Plaintiff claims that the evidence demonstrates that Foster Wheeler specified the use of asbestos gaskets to seal boiler casings, and those are the casings that seal the furnaces. Id. at ¶ 98. In order to clean the firesides, Mr. Shepherd would have removed those gaskets. Additionally, in order to get to the accesses that Mr. Shepherd used in cleaning the watersides he also worked with and was exposed to asbestos during the removal of manholes and handholds several times during his time aboard the U.S.S. Farragut. These manhole and handhold accesses were sealed with metallic asbestos gaskets. Id. at ¶ 99. The technical manual for Foster Wheeler specified the use of a power-driven wire brush to clean the seating surfaces for the manhole and handhold gaskets. Id. at ¶ 100.

Once the overhaul was done, the U.S.S. Farragut went on a six- to eight-month Mediterranean cruise, and Mr. Shepherd continued his assignment in the forward fireroom.

(Document No. 432 at ¶ 23). Mr. Shepherd assigned cleanup jobs to the third class men and supervised their work. Id. at ¶ 24. The U.S.S. Farragut returned to Newport, Rhode Island after the Mediterranean cruise and then went back out to sea. Id. at ¶ 26.

**III.    U.S.S. Richard E. Byrd**

The next relevant time period is Mr. Shepherd's time aboard the U.S.S. Byrd (DDG-23), which was stationed in Newport, Rhode Island. (Document No. 432 at ¶ 37). Foster Wheeler manufactured the four boilers installed on the U.S.S. Byrd. Two boilers were installed in each fireroom. Mr. Shepherd performed preventative maintenance on the equipment in a fireroom on the U.S.S. Byrd. (Document No. 497-2 at ¶ 107). The U.S.S. Byrd was laid down on April 12, 1961 at Todd Shipbuilding Corp. in Seattle, Washington and commissioned on March 7, 1964. (Document No. 432 at ¶ 38).

The U.S.S. Byrd took a six- to eight-month Mediterranean cruise during which time Mr. Shepherd was assigned to the forward fireroom. Mr. Shepherd remained a third-class boiler tender. He worked on equipment as part of planned maintenance, but could not identify particular pieces of equipment on which he worked. Id. at ¶ 40. Mr. Shepherd stated that the U.S.S. Byrd underwent an overhaul for three months before departing for a "GITMO cruise" during which time his assignment and duties remained the same. He could not recall his duties during the overhaul. Id. at ¶ 41.

Howard Tiffner, a shipmate of Mr. Shepherd's on the U.S.S. Byrd from approximately January 1973 to approximately January 1976, was produced for deposition. Id. at ¶ 42. Mr. Tiffner testified that he served on the U.S.S. Byrd from January 1971 until his discharge in January 1976.

Id. at ¶ 43. Mr. Tiffner testified that he was assigned to the forward fireroom on the U.S.S. Byrd, and Mr. Shepherd was assigned to the after fireroom. Id. at ¶ 45.

Mr. Tiffner testified that he remembered seeing Mr. Shepherd punching tubes on boilers because everybody partook in it. Mr. Tiffner could not recall when or how many times he observed Mr. Shepherd punching tubes on the boilers. Id. at ¶ 47. Mr. Tiffner recalled that there were two boilers in the forward and aft boiler rooms, and these boilers were 1,200-pound systems that had four burners with an operating pressure of 1,275 PSI and were manufactured by Foster Wheeler. (Document No. 497-2 at ¶ 113).

Mr. Shepherd recalled using the same Planned Maintenance System (PMS) on the U.S.S. Byrd as was used on previous ships. Id. at ¶ 114. Every 2,000 hours the boilers were torn down so the tubes could be punched, scraped and cleaned. To clean the boiler and get into the firebox side, the burner had to be removed. To get into the water side, you had a manway to crawl inside the steam and mud drums. There were gaskets between the burner and firebox as well as between the two manways to the steam and mud drums. All of these gaskets had to be replaced. Id. at ¶ 115. When the gaskets were removed, they stuck to the surfaces of the manways and had to be scraped off using a wire or cup brush which was a power tool. There were also gaskets associated with the hand hole plugs and plate on the superheater door of the boiler. All of these gaskets had to be changed each time the boiler was opened and frequently stuck to the metal surfaces of the boiler. Id. at ¶ 116. The work was the same on the U.S.S. Byrd as on the U.S.S. Farragut, where the gaskets were removed and replaced in order for the firesides to be cleaned. Id. at ¶ 117. Additionally, Captain Moore testified that Mr. Shepherd would have been exposed to some of the Flexitallic asbestos spiral wound gaskets used to attach valves to boiler components. Id. at ¶ 119.

Plaintiff asserts that the facts show that Foster Wheeler Corporation prepared and certified a Technical Manual for the Main Boilers on the DDG 23 to DDG 27 in May 1965. According to Plaintiff, the Technical Manual confirms that Foster Wheeler manufactured the main boilers on the U.S.S. Byrd and provided information on the asbestos-containing components that Foster Wheeler provided with these boilers, as well as additional asbestos materials that they specified.[1] According to Captain Moore, this Technical Manual is likely the technical manual used during the time of Mr. Shepherd's service on the U.S.S. Byrd. (Document No. 497-2 at ¶ 108). Furthermore, the boilers for the U.S.S. Byrd and the U.S.S. Farragut were both designed to operate at the same temperatures and pressures and were manufactured in the same time period to drive similar sized Navy ships. Id. at ¶ 109.

The parties dispute whether Foster Wheeler retained any control over design choices on the vessels in question or whether the Navy retained responsibility. (Document No. 432 at ¶ 54, Document No. 497-1 at ¶ 54). Further, Foster Wheeler contends that it was required to comply with Military Specifications which cover all specific components of the boiler, including accessories, subcomponents and materials required to fabricate the boilers and its components. (Document No.

---

[1] Specifically, the list of materials in the Technical Manual contained quantities of materials for a set of two boilers. The list contained: "fifty-eight (58) Flexitallic (or equal) metallic asbestos- spiral wound gaskets that Foster Wheeler provided to attach valves to boiler components." It also contained a list of about sixty-nine (69) valves provided by Foster Wheeler with each set of two boilers. Those valves with hand-wheels and stems contained asbestos packing since asbestos packing was required for valves exposed to superheated steam. The Foster Wheeler List of Material included a number of components manufactured by other companies but provided by Foster Wheeler with the main boilers. Asbestos gaskets were used to seal boiler casings. Large quantities of these gaskets were used on each boiler. The Foster Wheeler Technical Manual provided directions for replacement of these gaskets and noted: "remains of old gaskets should be removed by scraping and wire brushing." Id. at ¶¶ 110-111. Additionally, the Foster Wheeler list of materials specified asbestos-containing thermal block insulation and Fiberfrax sealing rope. Furthermore, Foster Wheeler also provided a list of repair parts and tools provided by Foster Wheeler; this list includes but is not limited to: 106 spare sets of packing and 91 spare sets of gaskets for the valves provided with the boilers, sixteen manhole gaskets for steam and water drums, 240 handhole gaskets for boiler headers, sixteen desuperheater gaskets, twelve man-hole gaskets and sixteen gaskets for piping. Id. at ¶ 112.

432 at ¶ 55). Plaintiff claims that Foster Wheeler could have warned of the asbestos hazards. (Document No. 497-1 at ¶ 55).

**Summary Judgment Standard**

Summary Judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When deciding a motion for summary judgment, the Court must review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. Cadle Co. v. Hayes, 116 F.3d 957, 959 (1st Cir. 1997).

Summary judgment involves shifting burdens between the moving and the nonmoving parties. Initially, the burden requires the moving party to aver "an absence of evidence to support the nonmoving party's case." Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). Once the moving party meets this burden, the burden falls upon the nonmoving party, who must oppose the motion by presenting facts that show a genuine "trialworthy issue remains." Cadle, 116 F.3d at 960 (citing Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995); Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994)). An issue of fact is "genuine" if it "may reasonably be resolved in favor of either party." Id. (citing Maldonado-Denis, 23 F.3d at 581).

To oppose the motion successfully, the nonmoving party must present affirmative evidence to rebut the motion. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-257 (1986). "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences,

[or] unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). Moreover, the "evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve." Id. (quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)). Therefore, to defeat a properly supported motion for summary judgment, the nonmoving party must establish a trialworthy issue by presenting "enough competent evidence to enable a finding favorable to the nonmoving party." Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993) (citing Anderson, 477 U.S. at 249).

**Discussion**

In its Motion for Summary Judgment, Foster Wheeler argues that there is insufficient evidence to establish that its equipment was a "substantial factor" in causing Mr. Shepherd's injury and that the so-called "bare-metal" defense shields it from liability. (See Document No. 430-1 at pp. 17-27). Foster Wheeler also asserts that Mrs. Shepherd's claim for loss of consortium does not survive its summary judgment challenge. In her Objection to the Motion for Summary Judgment, Plaintiff identifies several factual issues that she claims are material and preclude entry of summary judgment in Foster Wheeler's favor. The Court will discuss each in turn.

    **A.    Whether the Foster Wheeler Asbestos-Containing Equipment was a "Substantial Factor" in Causing Mr. Shepherd's Illness**

Foster Wheeler moved for summary judgment, arguing that the evidence demonstrates only a possible "minimal exposure to asbestos from a Foster Wheeler boiler." (Document No. 430-1 at p. 26). Foster Wheeler argues that Plaintiff's product identification evidence is insufficient and that Plaintiff has not met her burden of setting forth sufficient evidence from which a reasonable jury

could conclude that Foster Wheeler's product was a "substantial factor" in causing Mr. Shepherd's mesothelioma. Plaintiff, on the other hand, claims that the expert reports and testimony from Mr. Shepherd and his shipmates provides sufficient evidence to prove that asbestos from Foster Wheeler's boilers were a substantial factor in causing his injury.

In order to prove causation, "a plaintiff may rely upon direct evidence (such as testimony of the plaintiff or Decedent who experienced the exposure, co-worker testimony, or eye-witness testimony) or circumstantial evidence that will support an inference that there was exposure to the defendant's product for some length of time." Walkup v. Air & Liquid Sys. Corp., CV 12-1635-SLR-SRF, 2014 WL 2514353 (D. Del. June 4, 2014) report and recommendation adopted, CV 12-1635-SLR-SRF, 2014 WL 4447568 (D. Del. Sept. 8, 2014) (citing Abbay v. Armstrong Int'l, Inc., MDL No. 875, 2012 WL 975837 at *1 n.1 (E.D. Pa. Feb. 29, 2012)). "On the other hand, '[m]inimal exposure' to a defendant's product is insufficient to establish causation. Likewise, a mere showing that defendant's product was present somewhere at plaintiff's place of work is insufficient.'" Id. (quoting Lindstrom v. A-C Prod. Liab. Trust, 424 F.3d 488, 492 (6th Cir. 2005). "Rather, the plaintiff must show 'a high enough level of exposure that an inference that the asbestos was a substantial factor in the injury is more than conjectural." Id. (quoting Abbay, 2012 WL 975837 at *1 n.1).

Examining the evidence submitted, the Court finds that Plaintiff has identified sufficient evidence to present a trialworthy issue as to whether Mr. Shepherd's exposure to Foster Wheeler boilers was a substantial factor in causing his mesothelioma. As outlined above, Mr. Shepherd was a boiler tender, and Foster Wheeler was the manufacturer of the boilers on three naval vessels that Mr. Shepherd served aboard. Mr. Shepherd testified that he was required to participate in the

Planned Maintenance System which involved repairs and maintenance to the Foster Wheeler boilers. Testimony from Mr. Shepherd's shipmates indicates that he both completed work on the boilers and stood watch in the fireroom as work was completed. There is also testimony that Foster Wheeler specified the use of asbestos parts in its boilers. In light of Mr. Shepherd's testimony and that of his shipmates, a reasonably jury could conclude from the evidence that Mr. Shepherd was exposed to an asbestos-containing Foster Wheeler boiler such that it was a "substantial factor" in the development of his mesothelioma. Therefore, summary judgment in favor of Foster Wheeler is not warranted, and I recommend that the District Court deny the Motion.

> B. **Whether Foster Wheeler is Liable Because it "Knew" Its Pumps Would Require Future Replacement of Asbestos-Containing Components**

Next, Foster Wheeler asserts that it is not liable for asbestos-containing material that it did not place in the stream of commerce. (Document No. 430-1 at p. 17). Foster Wheeler specifically alleges that because Mr. Shepherd boarded each naval vessel after it was at least ten years old, he would not have had contact with any asbestos product manufactured or supplied by Foster Wheeler. This defense is sometimes called the "bare-metal" defense. The "bare-metal defense" shields a defendant from liability for a duty to warn of hazards inherent in asbestos products that a manufacturer did not manufacture or distribute. Conner establishes a general rule that there is no duty to warn of hazards inherent in asbestos products absent specific evidence that the company manufactured or distributed the particular asbestos-containing parts to which the Plaintiff was exposed. See Conner v. Alfa Laval, Inc., 842 F. Supp. 2d 791, 801 (E.D. Pa. 2012). Here, there are a number of factual disputes that foreclose the possibility of deciding this issue in Summary Judgment context.

Plaintiff asserts, for example, that Foster Wheeler supplied the Navy with "original and onboard spare asbestos component parts used on the boilers initially and during later repairs...." (Document No. 497 at p. 50). Plaintiff also claims that the evidence demonstrates that Foster Wheeler specified the use of a power-driven wire brush to remove "fused asbestos components" from the boilers, which caused the release of respirable asbestos fibers. Id. at p. 50. Because the Court is required to view the evidence in the light most favorable to the nonmoving party and because Plaintiff has set forth evidence from which a reasonable factfinder could resolve in favor of either party, summary judgment is not appropriate. Accordingly, I recommend that Foster Wheeler's Motion for Summary Judgment be DENIED.

### C. Whether Mrs. Shepherd's Loss of Consortium Claim is Viable

The next issue is Count 5, Mrs. Shepherd's loss of consortium claim. Foster Wheeler argues that general maritime law does not allow for a loss of consortium claim, citing several authorities. (Document No. 430-1 at pp. 27-31). Foster Wheeler also notes that even if her claim was not barred by general maritime law, it should fail as a derivative claim to Mr. Shepherd's claims. Id. at p. 31, n.6. Plaintiff disagrees, countering that 28 U.S.C. § 1333 "saves to suitors all common law remedies that the common law is competent to give – including disparate state damages for death." (Document No. 511 at p. 49).

In a recent case from the District of Connecticut, the Court declined to accept arguments similar to the ones made by Foster Wheeler in this case. See Bray v. Ingersoll-Rand Co., 2015 WL 728515 (D. Conn. Feb. 19, 2015). That Court stated, "[s]ome defendants have argued that general maritime law does not allow recovery for loss of consortium claims. [ ] Those arguments conflate the statutory limitations placed on recovery for cases brought under the Death on the High Seas Act

("DOHSA"), 46 U.S.C. § 762, and the Jones Act, 46 U.S.C. § 688, with actions brought under common law. Since 1980, the Supreme Court has held that DOHSA and the Jones Act do not preclude claims made under state common law for wrongful death and loss of society, as well as other personal injury torts." The Court also cited Yamaha Motor Corp., 516 U.S. at 213-216; Jerome B. Grubart, Inc., 513 U.S. at 545 (maritime jurisdiction "does not result in automatic displacement of state law"); cf. In Re Dammers & Vanderheide & Scheepvaart Maats Christina B.V., 836 F.2d 750, 756 (2nd Cir.1988) (noting that general maritime law allows a spouse to bring a common law claim under state law for loss of consortium)". Because the District of Connecticut has succinctly and persuasively concluded that a loss of consortium claim survives in a federal maritime case, I also recommend that the District Court DENY Foster Wheeler's Motion for Summary Judgment as to the loss of consortium count for the reasons articulated in Bray.

**Conclusion**

For these reasons, I recommend that Foster Wheeler's Motion for Summary Judgment (Document No. 430) be DENIED. Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within fourteen (14) days of its receipt. See Fed. R. Civ. P. 72(b); LR Cv 72. Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

  /s/   Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
May 13, 2015